We call our next case for the morning, Mary Arnold v. UAL. Mr. Horowitz, give us just a moment. All right, you may proceed. Good morning, Your Honors. May it please the Court. Jeremy Horowitz with the amicus EEOC in this case. And I'd like to address two primary points today, if I could. First, that a reasonable jury could find that the actions United took against Ms. Arnold satisfied Muldrow's new test for an adverse employment action as part of a disparate treatment claim. And second, that a reasonable jury could find that the PIP satisfied Burlington Northern's likely to dissuade a reasonable worker standard for retaliation claims. So, turning first to the disparate treatment claim, the District Court erred when it applied this Court's pre-Muldrow standard to find that United did not subject Ms. Arnold to a sufficiently adverse employment action. But Muldrow clarified that this material adversity requirement is not the law, and instead stated that a plaintiff needs only to show that there was some harm to an identifiable term or condition of employment. A reasonable jury here could find both that losing the Core 4 project and being placed on a PIP were both sufficient to meet Muldrow's some harm standard, or some harm threshold. With respect to the Core 4 project, it was an expression of United's foundational company values. It was high priority for United. Ms. Arnold testified that it was high profile, high exposure for her, and that she found it really rewarding. She also testified that after she was taken off the project and given something else, that that was not nearly as rewarding a job assignment. So, a reasonable jury could find that losing that project met Muldrow's standard for some harm to the terms or conditions of employment. Turning next to the PIP, she testified that it created substantial additional work for her. She also testified that it created a pervasive layer of constant scrutiny and threats. These threats were borne out by the terms of the PIP itself, which said that even after its successful completion, somebody who had been on that PIP would still be subjected to an accelerated termination process in the future. So, a reasonable jury hearing that could certainly find that that was enough to constitute some harm in the terms or conditions of her employment. Then, turning to the retaliation claim. Would a negative review amount to set aside the Muldrow standard, do you think? Potentially, it could, Your Honor, if the negative review was, you know, that sort of goes to the causal element. If the negative review was because of an employee's protected characteristic. Well, that's, those are two separate questions. Well, yeah, so, I'm sorry, Your Honor. Assume improper motivation. Is the negative review on its own an adverse action under Muldrow? It would not be under our case law, as I understand it, going back several decades. Yes, Your Honor. I believe in Your Honor's hypothetical, a reasonable jury could find that that did constitute some harm, the negative performance review, if it was given. And, again, I realize I'm shading into the causation element, and you wanted to stick to just the some harm aspect. But, in this case. That's what I understand your amicus brief wanted to do. Yes, exactly. Precisely. Trying to stay within your limits. I appreciate that, Your Honor. I appreciate that. Okay. Yes. So, yes, in that case, I believe a negative performance review could, in fact, be sufficient to create some harm in the terms or conditions of the employment. I'd like to turn to the retaliation claim. A reasonable jury could find that the PIP on which United placed Ms. Arnold, after it finished investigating her complaint of age discrimination, was sufficiently adverse to meet the Burlington Northern retaliation standard. That PIP qualitatively changed the conditions, or a reasonable jury certainly could find, that that PIP changed the qualitative conditions of the plaintiff's work, which this court held in Louth was enough to meet the material adversity standard for a retaliation claim. Again, as I described, it was the additional scrutiny, the threats of termination, the additional workload, and the threat of termination that extended well beyond its completion. And a reasonable jury could find, when presented with that, that such a PIP could well be sufficient to dissuade a reasonable worker from coming forward with a complaint of discrimination, which is the test under Burlington Northern. I see my time has almost stopped, so if Your Honors have no additional questions. Thank you. Thank you.  Good morning. May it please the Court. My name is Connie Tarley, and I am a third-year law student arguing under the supervision of Professor Danielle Hamilton. We also represent the plaintiff appellant, Ms. Mary Ann Arnold, who is here in the courtroom gallery. In addition to my co-counsel's argument about the applicability of Muldrow to Ms. Arnold's case, we ask this court to reverse the District Court's grant of summary judgment in favor of United, and find that Ms. Arnold has raised genuine issues of material fact as to her retaliation, hostile work environment, and constructive discharge claims. Starting first with her claim of retaliation, the record shows that in October 2019, at around the same time that Ms. Arnold was making repeated internal complaints to Human Resources and to United's deputy counsel, there were documented discussions within United's upper management to push Ms. Arnold out of the company in response to these internal complaints. As part of these documented— What is the nature of the internal complaints that you're referencing, Ms. Tarley? Your Honor, Ms. Arnold made complaints to HR and to United's deputy counsel about her seating arrangement near her former supervisor, whom she had accused of sexual harassment twice, and she also complained about her removal from the CORE4 project and its being reassigned to a younger, lower-level employee. So we had a little bit of some sexual harassment complaints and age complaints. I think it would be easier if we would separate out what went to which claim. And so for purposes of the retaliation, did she allege below that she was being retaliated because of her sexual harassment complaints? She did, Your Honor. Although her prior counsel did not explicitly write these sex-based internal complaints into the claims portion of her complaint, the facts section of her complaint, as well as her response to United's motion for summary judgment, are replete with these allegations of sex-based protected activities that do serve as a basis, in addition to her age-based protected activities, of her retaliation and hostile work environment claims. And so I've had an opportunity to review the response, and so the representation is that she was also raising sexual harassment complaints in regards to the retaliation. And so when we're looking at the amended complaint, I noticed that the sexual harassment claim had been removed because it was in the original but it was not in the amended. Your Honor, it's unclear as to why prior counsel removed the explicit mention of that complaint. However, in the facts section of her complaint, she does still discuss that she engaged in protected activity at the time that she was making these internal complaints about her seating arrangement. Regarding the exact mentions of that in the record itself, or rather in the complaint, for example, on paragraph 16 through 17, Arnold alleges that she did report her former supervisor for sexual harassment, and then additionally in paragraph 23, she alleges that she was harassed based on age and in retaliation for participating in a protected activity. And it's a reasonable inference in Ms. Arnold's favor that that phrase, and in retaliation for participating in a protected activity, does refer to her sexual harassment complaints against her former supervisor, as well as the continued complaints regarding being forced to sit near him. And this also goes to her hostile work environment claim, and I realize I'm sort of blending the two together, but at least in as far as her seating arrangement was concerned, the fact that she was forced to sit near her former supervisor and the fact that when she escalated this complaint, she was told to consider her— And where was it raised in the response? In the response to United's motion, for summary judgment, page 9 of the response indicates that Ms. Arnold engaged in several instances of protected activity, including reporting her former supervisor for sexual harassment and making internal complaints about being assigned to sit near her former supervisor. And again, part of her hostile work environment claim is that this created a very objectively and subjectively offensive and abusive work environment, as during that time she reported that she was seeking treatment from doctors for the physical and emotional stress from this very distressing situation and that she was regularly crying at work. And again, when she escalated this, United initially told her that she should just consider her long-term plans at the company. But circling back a little bit to retaliation, there is a strong causal relationship between these internal complaints that she made and then her placement on a PIP and the issuance of a negative review, which was the first negative review she had received in her 25-year career at United. This court has acknowledged that things like suspicious timing as well as vague or ambiguous statements from an employer can be circumstantial evidence of causation, and Ms. Arnold has provided evidence of both. Regarding vague or ambiguous statements, there were documented discussions within United's upper management about offering her a retirement package at the time that she was making these internal complaints. We have to slow down because we're merging the different complaints, and this is what the district judge emphasized repeatedly. The 2018-2019 internal complaint is about sexual harassment, and so the retaliation in 2017 when she makes the age complaints, how are we tying that to the PIP? Your Honor, we don't dispute the district court's finding regarding her 2017 complaint. However, as part of the internal complaints that she was making in October 2019, she did identify herself as an individual over the age of 40, thus falling within the protected class of the ADEA, and she did discuss about how the 4-4 project was taken away from her and reassigned to a younger employee. And this was, again, a complaint that was raised to United's deputy counsel, thus falling within a kind of age-based protected complaint that can certainly serve as the basis for both her retaliation and hostile work environment claims under that statute. And, again, there's evidence of ambiguous statements made by United. There's no representation, though, that the hostile work environment in the complaint was tied to sexual harassment. There is, Your Honor, and that's because the hostile work environment, Ms. Arnold alleges, was in response to her making these protected complaints and her status as someone who had engaged in protected activity related to both sex and age. Is the ambiguous statement you're referring to the one by Michelson? Your Honor, the ambiguous statements specifically are in Document 47-13. These are documented discussions among United's upper management in which they, after debating whether to offer her a retirement package, ultimately decide to focus on performance. And then just a few months later, Ms. Arnold received the first negative review of her 25 years in United and was placed on an onerous PIP that is distinguishable from other PIPs examined by this circuit in that it not only overloaded her with often very menial and time-consuming tasks but also subjected her to a level of scrutiny and blame. Counsel, I'm looking for some indication of age-based animus. Your Honor, at least as far as the retaliation claim goes, and I see my time is about to run out. I've got a couple other questions. Please answer. At least as far as the age-based retaliation argument goes, the fact that Ms. Arnold did make an internal complaint about age discrimination and then just several months later received the first negative review of her career does indicate that there was some sort of causal relationship between that age-based complaint. Sorry, I'm going back to the merits of the age claim. Is there any indication of age-based animus here? If discussing the merits of the age discrimination argument, there is looking at the circumstantial evidence that Ms. Arnold has provided, specifically that she suffered an adverse employment action, as my co-counsel mentioned. I'm asking for some explicit. If you want to just rely purely on an indirect McDonnell Douglas proof, that's fine. But I had understood you to be arguing in your brief that you thought you had some indication of age-based animus on the Michelson comment. Yes, Your Honor. So that statement. My question about Michelson is whether there's any indication that she had anything further to do with decisions about Ms. Arnold's employment. Your Honor, the record shows that Michelson was included on all of the discussions regarding potentially offering Ms. Arnold a retirement package. And that she was copied on e-mails? Yes, Your Honor. Anything else? No, Your Honor. Okay, thanks. A couple of quick questions. Am I correct that all the sex-based claims arise only under state law here? Yes, Your Honor. Okay. Also, in your appendix, I was looking for the judgment. I didn't see it. If I may clarify, Your Honor, are you discussing the district court's opinion? Yes, the Rule 58 judgment. Not the opinion, the Rule 58 judgment that says the case is over. Your Honor, I can address that further on rebuttal. I would have to double-check to see if that was included in the appendix. It's not in mine, so thank you. It's a required part. Thank you. Thank you, Your Honors. All right, thank you. Mr. King? Good morning, Your Honors, and may it please the Court. This is a case like so many before it where the plaintiff subjectively believed that her performance was far greater than it was in the eyes of her supervisors and managers, and that would be multiple supervisors and managers, both before the reorganization and after the reorganization of the department. Under Appellant's version of events, she had no performance issues at all until after the reorganization and after she started sending emails in October of 2019. But the undisputed facts tell a far different story. As far back as her year-end evaluation in 2018, and then again in her mid-year evaluation in 2019, the same themes and the same comments on her performance deficiencies were included way back then. In fact, they were so significant that prior to the reorganization, her supervisor at the time, Ms. Millichap, went to HR and spoke with Ms. Tirado about her concerns about Ms. Arnold's performance deficiencies. All of this predates even the reorganization and it predates these October emails that were discussed previously. Not only that, with respect to the performance issues that were documented in the PIP itself, Ms. Arnold did not even claim that those performance issues were not legitimate. She was asked at her deposition if those were accurate and legitimate critiques of her performance, and her answer was, I can't recall. So Ms. Arnold doesn't even allege that. Jumping to the sex-based claims, as Judge Pryor pointed out, that was expressly removed in the amended complaint, and counsel is trying to suggest that, well, there's some paragraphs where you can infer something like that. This isn't an esoteric issue. This is like your main claims. Are you alleging gender-based discrimination, gender-based hostile environment, or gender-based retaliation? And for that to be completely absent in the complaint, and more importantly, rather the amended complaint, but more importantly, to not raise those issues in the district court in response to our motion for summary judgment. So there are suggestions in the briefs that the counsel below should have raised certain things and didn't. I can only tell you that this was a long, hard-fought piece of litigation, and if they believed they had a gender-based complaint, counsel would have been jumping up and down in response to our motion for summary judgment, which never happened. In her response to the motion for summary judgment, counsel did direct the court to retaliation and lawful retaliation. And on page 9 of the response, it said, one of the protected activities that we want the court to consider is the 2018 complaints of Stephen Jones for sexual harassment. Yes, and our response and our point was that it was clear to us that they were only alleging an age-based retaliation claim. So our response was you cannot use these prior gender-based Stephen Jones complaints as protected activity that would support the age claim. Now, again, without some clear indication that they're alleging a gender-based claim, that was our understanding that they were not, and so our argument was that you can't use these gender-based things for your age-based discrimination claims. Turning to the discrimination claims, with respect to Muldrow in particular, even setting that aside for the moment, because I don't think this court needs to reach that question unless it so desires, because the district court correctly entered summary judgment for several other independent reasons, including that there was no showing of any substantially younger employee who was similarly situated and treated more favorably. Her coworker, JP, was not substantially younger, and obviously that creates a presumption that age was not a factor. Appellant has certainly not overcome that presumption with any evidence, and frankly the most that they can muster is this one comment from Michelson inquiring about her seniority date in the same conversation of telling her that she, Michelson, had just recently joined the company. So there are cases before this court where the court has been clear that even overtly asking employees about their retirement plans is not evidence of age discrimination, so we certainly don't have any here. What aspects of Arnold's job responsibilities changed after the reorganization? Not much. I mean, she was still responsible for internal corporate communications. They may have been not for the same areas, but it was essentially the same job. You know, the core four, which she acknowledges in the complaint, was 85% complete at the time of the reorganization. That was moved under a separate group of employees, and again, those employees were not similarly situated because they were part of a newly created team to focus on projects like core four, but not only core four. Other projects that Ms. Arnold had nothing to do with. So, you know, I hear the suggestions to the contrary, but there's really no evidence in the record that her job duties were materially changed as a result of the reorganization. And, you know, with respect to Muldrow, again, you know, we recognize that this court has stated that Muldrow may apply outside of the context of a job transfer, but it's really Appellant who has been arguing that this is a job transfer case and trying to neatly fit this case under Muldrow and the other job transfer cases. In our view, this is not a job transfer case. A job transfer is when someone is singled out for some reason and transferred to a less desirable position. I mean, what we have here is a complete reorganization of an entire department that impacted not only Ms. Arnold, but tons and tons of other employees and other employees on her team. So this is really not a job transfer case. And why that's relevant is that I think the job transfer cases, by their very nature, are more adverse. Again, that's somebody being singled out and moved into a less desirable situation. That's inherently more of an adverse employment action. Mr. King, I take it you'd agree that Muldrow's logic does extend to the Age Discrimination Act. It does, yes. Can I also ask you to focus on one of these conversations, I think it was in the fall of 2019, where the plaintiff was complaining about her being seated close to Mr. Jones after this reorganization, and it was a Patterson responded in that discussion that we need to focus on her performance. Help me understand why that was germane. Well, I think the question at the time was, well, they were already focused on her performance, number one. That's the reason that she was put on the PIP and that they were having these performance management discussions. But in response to a complaint where somebody who has previously made a complaint of sex harassment, you know, ordinarily most employers will try to work out some kind of separation in those cases. She's put back within a few feet of him, as I understand the evidence here. And when she raises a question about that, people say, well, let's focus on her performance. Yeah, I think it was Ms. Tirado who said, and she was just questioning, and I think reasonably and rightfully questioning, you know, what is the message does that send if we're going to just give a separation agreement to a poor performer. Again, the performance issues have gone all the way back to 2018. So, you know, she believes that they should continue in their process of focusing on her performance and not reward, if you will, someone with a separation agreement who is a poor performer. So that was the basis of that response. I guess I'm having trouble. Would that be thought of as a reward? I thought that was kind of a basic step when you've got he said, she said kinds of conflicts and accusations of sexual harassment, particularly if an employer doesn't want to run it to the ground and figure out who's telling the truth and who's not. Yeah, there had already been an investigation years prior of the entire sexual harassment complaint, and it was found to be unfounded. So this was not raised near the end of her employment. She brings it up again near the end of her employment, but there was a full investigation previously on that. And, you know, action was taken. She complained about where she was going to have to sit, and United made a change and allowed her to sit even further away, and she gave some acknowledgment that that was, you know, acceptable to her. But wasn't that made so she meets with general counsel, and then the next day we have this email traffic saying, now we're going to focus on her performance? Well, I don't think that was the context of, now we're going to focus on her performance. I think the response was we're going to continue to focus on her performance. It says we will focus on performance. The day after she receives basically a workaround, HR. HR has told her, nope, we're not moving you, in essence, and then she meets with general counsel. General counsel agrees with Ms. Arnold. The next day there's email traffic, including HR representatives and her supervisors, we will focus on performance. And I think it's clear in the context of those communications that there were two things at issue. Are we going to go a separation agreement route, or are we going to continue to focus on her performance? And it was Ms. Tirado who, as an HR person, sort of sounded the note of why and what message would that send if we were going to issue a separation package to a poor-performing employee. They dealt with the harassment-related issue in terms of giving her a better seating arrangement. But those were the choices of whether, and when I say rewarding, I mean a separation package would presumably include some compensation. So you're talking about separation, not just seating arrangements, but rather leaving the company with some money.  Okay, sorry, I misunderstood. Those were the two things. Do we give her a package, pay her to leave the company, or do we continue to focus on performance? So those were the two things under consideration. I don't think it's unreasonable for an HR person who's been dealing with issues for over a year about a particular employee to question why would we give her a separation package. So that's the context of those discussions. I had a lot more I was going to go through, but I don't think I need to go through all of it. Again, on the retaliation, I think all there is is an age-based retaliation claim, and there's no evidence in this record that anyone ever said anything about Ms. Arnold's age, no basis for believing there's any age-related animus, or for that matter, gender-related animus. There's simply no evidence of that in the record. There's certainly no causal connection between anything that she complains about and any protected activity in that regard. We disagree that the things that she alleges, being put on a PIP and having a portion of her one assignment transferred to somebody else, we don't think that meets the materially adverse standard for retaliation, which, frankly, is now more exacting than the Bolger standard for discrimination. I think the Supreme Court wants us to draw two different lines now between retaliation and discrimination cases, having now flipped the relative burden. I think so. I think there were always two different lines in terms of, one was adverse employment action, which was a focus on, did they lose any money, did they get demoted, and then the material adverse standard could be broader, could be things, I think even the courts have talked about, there could be things that happen even outside the workplace that could fall under this kind of materially adverse standard. So there's no question that the court narrowed the discrimination standard under Muldrow. They relaxed it. Yeah, relaxed it, yeah. But to your point, Judge, you asked the question, I think that if there was just a poor performance evaluation, would that be an adverse employment action? And I hope that answer is no. Otherwise, every performance evaluation, every performance improvement plan is going to lead to a cause of action, is going to be before this court, and you'll be asked to sit as a super personnel department, which you've said countless times is not your responsibility. With that, if there are no more questions. Thank you. Mr. Allen? Your Honors, may it please the court. My name is Jacob Allen, representing Plaintiff Appellant Ms. Mary Ann Arnold. First and foremost, the Rule 58 judgment, Judge Hamilton, to your point, was inadvertently omitted from our appendix. We would like to seek leave to supplement the appendix. We know where to find it. I'm just saying, and it's not a big problem here, but there's a reason that it's in the rule. We don't need to worry about amending documents at this point, in my view. Yes, Your Honor. And Judge Hamilton, to another point you made earlier, you asked whether any negative review would satisfy the adverse employment action standard set forth in Muldrow. And to us, we agree with some of the comments stated at the end by United there that not all negative reviews would constitute an adverse employment action under Muldrow. However, even predating Muldrow, there's case law in this court, such as Louthby Covance, that states that a performance improvement plan or a negative evaluation with Moore can constitute an adverse employment action. What's the Moore here? The evidence of Moore, the conditions that make this PIP particularly onerous, are that Ms. Arnold's quantitative amount of work was increased. She was assigned additional assignments, particularly menial assignments. She was asked to identify trainings, to sit in on lengthy regular meetings, to create agendas, things that were far below the expected assignments for someone that had been with the company for 25 years and the assignments she had typically been doing. Is there any evidence in the record of what would have been the expected assignments for someone in her situation? Yes, Your Honor. It really speaks to the change in assignments and the change in the nature of her work following the placement on the PIP. She was simply not interacting with business partners to the same degree. She was, again, being asked to do very low-level menial work, such as create agendas. At the same time as these very quantitative changes, she was experiencing disparagement publicly in front of business partners, in front of coworkers. These conditions are not analogous to other cases from this court that are simply negative evaluations. Things of the nature where business partners would praise Ms. Arnold's work and say that they had no comments and they were satisfied with it, and a supervisor such as Ms. Shaw would come in after the fact on the same email thread and very publicly criticize the work that was already receiving praise. That happens in my chambers. Yes. People will evaluate one another's writings, and some people say it looks good to me and others say not so much. Is that part of a hostile work environment? Well, no, Your Honor, not necessarily, but it is the amalgamation of these conditions. So you have repeated instances where this is taking place, and the tone and the content is particularly disparaging towards Ms. Arnold. And within the conditions already being imposed through the PIP, this in and of itself was hindering her professional reputation, harming her business relationships within the company. And then on top of that, even when she's producing quality work in the eyes of her business partners, she's being repeatedly forced. This PIP came after the reorganization, am I right? Yes, Your Honor. About how long after the reorganization? The PIP came roughly four months after the reorganization. And she suffered adverse employment actions in both instances because the transfer and speaking to a point asked earlier, you know, United raised that this was not necessarily a transfer. And the record says in 4710 you can see that Ms. Arnold was transferred from a group of corporate writers comprising roughly 20 or so individuals to a group of three and then two writers. At the same time, her workload is being increased, and the COVID pandemic has led United to implement a policy where they're cutting everyone's hours by 20%. So she has less hours in the day to complete her work, yet she's being assigned additional work, more menial work, and she's being criticized while completing that work, even when the work product is deemed positive by her business partners. When was it she resigned? She resigned in May 2020, Your Honor. So a few weeks after the COVID pandemic spread. Yes, within the same few-month period, yes, Your Honor. Thank you. Am I out of time here? Yes, you are, Counselor. Thank you so much. For these foregoing reasons, I'd ask that you reverse and remand. Thank you, Your Honors. Thank you. And thank you, Counselor, for both sides. I also want to especially extend our thanks to Northwestern and Professor Hamilton, Ms. Turley, and Mr. Allen for representing Ms. Arnold in this matter. We appreciate your service to the court. Thank you.